**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **NATISHA STREET,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24 C 50430** |
| | ) | |
| **MERCY HEALTH CORPORATION,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Natisha Street worked at Mercy Health Corporation ("MercyHealth")[1] as a medical assistant from August 2022 until her resignation in September 2024. During this time, she had several interactions with Mr. Ronnia Lottie, another MercyHealth employee who delivered trays of food to patients' rooms. After two alleged incidents of sexual harassment—one involving touching and another involving sexually explicit remarks—Street filed a complaint with MercyHealth's Human Resources office ("HR"). HR staff investigated the sexual harassment allegations; Lottie denied them, and HR concluded there were no other witnesses. HR personnel informed Street that the investigation had concluded, communicated that Street's complaint had not been substantiated, and stated that they had issued an order prohibiting Lottie from having any further contact with her. Dissatisfied by this result and by the investigation, Street resigned and filed a charge of discrimination with the Equal Employment Opportunity Commission (Compl. [1] ¶ 5) and later initiated this lawsuit, charging MercyHealth with sex discrimination, sex-based harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964. (*See* Comp. ¶¶ 43–68.) Defendant seeks summary judgment on all of Street's claims, and, as explained below, the motion is granted.

---

[1] The parties shortened Mercy Health's name to "MercyHealth," and the court follows the parties' designation.

**BACKGROUND**

The facts laid out below are taken from the parties' respective Local Rule 56.1 filings.[2] In considering a motion for summary judgment, the court construes the facts in the light most favorable to the nonmoving party and draws "all reasonable inferences in [her] favor." *Blumenshine v. Bloomington Sch. Dist. No. 87*, 150 F.4th 882, 886 (7th Cir. 2025). All material facts set forth here are undisputed unless otherwise noted.

MercyHealth hired Plaintiff Natisha Street as a medical assistant on or about August 1, 2022. (DSOF [40] ¶ 1.) She began working at the corporation's Rockton location and held several positions at multiple locations throughout her employment with the company. (*Id.*) It is undisputed that MercyHealth "maintained written policies prohibiting discrimination, harassment, and retaliation," including complaint reporting and investigation procedures that were available to Street. (Pl. Resp. DSOF [44] ¶ 10.) Plaintiff "received and acknowledged the company's anti-harassment and anti-retaliation policies" and "completed annual sexual harassment training." (*Id.* ¶ 11.) The parties agree, further, that MercyHealth had a workplace violence prevention policy, though Street disputes ever having reviewed or acknowledged it. (*Id.* ¶¶ 12, 13.)

Sometime in December 2023, Street's cousin, Ms. Nakeal Willis, who was also a MercyHealth employee, asked Street if she would be comfortable with Willis's sharing Street's phone number with Ronnia Lottie, a MercyHealth employee who was assigned to delivery of trays to patients' rooms at Javon Bea Hospital in Riverside, Illinois. (DSOF [40] ¶¶ 3, 4.) Street agreed. (*Id.* ¶ 4.) Street and Lottie exchanged some text messages, and on an evening in December 2023, Lottie showed up at Street's house and remained there for no more than fifteen minutes, during which the two had some physical contact. (*Id.* ¶ 5; Pl. Resp. DSOF [44] ¶ 5). It is

[2] Defendant's Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [40] ¶ __." Plaintiff's response to Defendant's Local Rule 56.1 Statement of Material Facts is "Pl. Resp. DSOF [44] ¶ __." Plaintiff's Local Rule 56.1 Statement of Material Facts is cited as "PSOF [45] ¶ __," and Defendant's response to Plaintiff's Statement of Material Facts is "Def. Resp. PSOF ¶ __."

undisputed that Lottie sat on the couch, rubbed Street's feet, and sucked her toes. (DSOF [40] ¶ 5.) Plaintiff admitted that "she permitted Mr. Lottie to briefly rub her foot," but "denie[d] that she consented to any further physical contact," and notes that "[a]ny conduct beyond that [that is, sucking her toes] . . . was unwelcome and nonconsensual." (Pl. Resp. DSOF [44] ¶ 5; Street Dep. [40-2] at 72:3–12.) Street told Lottie she wanted him to leave because he had crossed that line, and at the same time, Lottie's spouse showed up at Street's home. (Street Dep. [40-2] at 72:8–73:19.) Lottie and his wife argued in her yard and Street asked both of them to leave. (Street Dep. [40-2] at 72:8–73:19; Pl. Resp. DSOF [44] ¶ 6.) Lottie testified that he returned to her home later, picked her up, and had intercourse with her at his home that night. (Lottie Dep. [40-3] at 28:12–16; 39:8–15.) Street disputes the accuracy of this testimony—she testified that Lottie called her about 30–60 minutes after he and his wife left her house and said he was returning to Street's house, but that Street told him not to do so because he was married and should not have "put [her] in th[at] type of position." (Street Dep. [40-2] at 73:20–74:12; *see also* Pl. Resp. DSOF [44] ¶ 37.) She testified "he did not come back, and that was the end of it." (Street Dep. [40-2] at 74:11–12.) When interviewed later, Plaintiff's cousin, Nakeal Willis, told HR staff that Street and Lottie had slept together; the source of Willis's information is unclear, but Plaintiff admits that Willis made the statement. (DSOF [40] ¶ 43; Pl. Resp. DSOF [44] ¶ 43.)

Street did again see Lottie in her capacity as a medical assistant in January 2024 and again in April 2024. (DSOF [40] ¶ 7.) On these occasions (apparently medical appointments) Street took Lottie's blood pressure and medical history and prepared him to see the doctor. (*Id.*) Citing Street's testimony, MercyHealth asserts that "[n]othing happened" at the January visit, presumably meaning that nothing improper took place. In fact, Street testified that during the first five to ten minutes of the January visit, Lottie apologized for the December 2023 incident but she "shut that conversation down real quick," and that ended their interaction. (Pl. Resp. DSOF [44] ¶ 8; Street Dep. [40-2] at 90:10–11.)

According to Street, at the conclusion of the second of these appointments—in April

2024—she took Lottie to the exam room, and as she was leaving that room with the medical cart, Lottie grabbed her buttocks. (DSOF [40] ¶¶ 14, 15.) According to Street, "He grabbed it hard . . . . It was not . . . brushing. He straight up grabbed my ass."[3] (Street Dep. [40-2] at 101:8–11; PSOF [47] ¶ 1.) Lottie's contact was "quick, lasting seconds," because Street immediately pushed his hand away, and warned him, "if you touch me again, I will cut your fucking throat." (DSOF [40] ¶¶ 16, 17.) Street did not immediately report this incident to any supervisor or to HR staff, but she was upset and told multiple coworkers what had happened, instructing them, "You all come get me when he's out of the clinic. I don't want to see him." (PSOF [45] ¶¶ 2, 3.) She did not see or interact with Lottie again until August 1, 2024. (DSOF [40] ¶ 17.)

Defendant asserts that Lottie believes that during one of these two visits, Street intentionally fabricated false information about drug and alcohol abuse in Lottie's medical records because (he suspects) she was angry about his marital status. (DSOF [40] ¶ 9.) Street admits that Lottie believed she had falsified his medical records, but denies she engaged in any wrongdoing; notably, without actually saying that Lottie had admitted to drug or alcohol use, she asserted that it was "equally possible" that he had done so and that no "evidence supports Mr. Lottie's assertion that Plaintiff altered any response for retaliatory reasons." (Pl. Resp. DSOF [44] ¶ 9.) She notes that, as a part of her job, she was required to ask patients if they used drugs—she said, "I can't remember how often, but you have to keep everything up to date." (Street Dep. [40-2] at 94:11–22.) She further testified that she could not remember whether she made any "indication or change to his medical record about what he used" in that visit, but stated that she fills out patients' charts truthfully based on what they tell her. (*Id.* at 96:2–15.)

In late July or early August 2024, the Rockton location where Street had been working was closing, and Street accepted a medical assistant position at the Riverside hospital location.

[3] Defendant agrees with all statements except that Lottie "grabbed it hard" or that he "squeezed [her] butt," but Street did testify to this effect in her deposition. (Street Dep. [40-2] at 100:13, 101:8–11.)

(DSOF [40] ¶ 2). Recall that Lottie worked there, though in an entirely different role: he delivered trays of food to patients. (*Id.* ¶ 3.) During Street's first week at Riverside, on August 1, 2024, at around 7:30 a.m., she went to the hospital cafeteria, and as she placed a food order, Lottie stepped up and told her, "they fixed my chart," apparently in reference to a correction made in the record concerning his drug use. (*Id.* ¶ 19; Pl. Resp. DSOF [44] ¶ 19.) This is the first time Street had seen Lottie as a MercyHealth employee, rather than as a patient or outside of the workplace. (DSOF [40] ¶ 60.) Street and Lottie spoke for a couple of minutes, during which time Lottie did not raise his voice or make physical threats or contact (*id.* ¶ 20), but Street testified that he was "breathing down [her] neck." (Street Dep. [40-2] at 172:13–14; PSOF ¶ 9.)[4] She testified, further, that during this exchange, Lottie made degrading and profane remarks, including: "if you want me, you should have just told me;" "yeah, you know you want this dick. You need to leave . . . those white men alone . . . ;" and "I am not divorcing my wife just to fuck you." (DSOF [40] ¶ 21; Street Dep. [40-2] at 125:10–17, 126:3–127:2.) Street responded with profanity in turn. She asked, "what the fuck are you talking about?" and told him, "I don't know what the fuck is wrong with you;" "I don't want you . . . I don't deal with married people;" "yes, I like white men. If you are not white or Obama, get the fuck away from me;" and "you look like you have an STD anyway." (DSOF [40] ¶ 22; Street Dep. [40-2] at 125:18–126:10.) Lottie then walked away. (DSOF [40] ¶ 22.)

While she waited for her food order, Street alleges, Lottie returned and made additional remarks, including that he knew she "want this dick in [her] life," that he could prove he did not have a sexually transmitted infection, and that he heard she was crazy. (*Id.* ¶ 23.) Street responded by telling him to "get the fuck away," that she would "fuck [him] up," and that he was harassing her; but someone else walked into the area, and Lottie left. (*Id.*; Street Dep. [40-2] at

[4] Defendant disputes that Street gave this testimony, but only on the basis that Street failed to include the correct page numbers in her citation to her deposition. (Def. Resp. to PSOF [47] ¶ 9.)

126:20–128:13.) After he was gone, Street reported what had happened to an unknown employee, later determined to be Lisa Willett (DSOF [40] ¶ 35), in a nearby office; Willett did not witness the exchange but advised Street to write down what had happened and to contact HR. (DSOF [40] ¶ 24.) Street went upstairs from the cafeteria and into a supply closet, in tears. (PSOF [45] ¶ 5.) She proceeded to leave voicemails and make a written complaint to HR about what had just happened, disclosing in her complaint that Lottie had grabbed her buttocks when she saw him as a patient earlier that year. (*Id.*; DSOF [40] ¶ 30.) HR Business Partner Brittany Hereford replied to Street the same day, and scheduled an interview with her the next morning, August 2, 2024. (DSOF [40] ¶ 27.)

On August 2, Hereford and Christine Moss, Senior Director of People and Culture, interviewed Street. (*Id.* ¶ 28.) Street gave them a handwritten statement, which she prepared that morning, describing the cafeteria incident. (*Id.*) The handwritten statement described Lottie's alleged sexual remarks and asserted that he had followed her around the cafeteria. (PSOF [45] ¶ 8.) Street said she did not know if there were any witnesses to the event, but she noted that she had described the conversation when she spoke to Lisa Willett the previous day. (DSOF [40] ¶ 29.) She also told Hereford and Moss that she knew Lottie from the December 2023 incident, relaying the details "of him sitting on her couch, sucking her toes, and having his wife show up." (*Id.* ¶ 31.) Street acknowledged that she had threatened to cut Lottie's throat in response to the alleged patient incident and that she told him she would "fuck him up" in response to the cafeteria conversation. (*Id.* ¶ 33.) She announced, further, that she would repeat these threats if he again spoke to her in that way. (*Id.*) Moss said, "we are going to have to circle back, have a conversation with you about the way you speak to [Lottie]." (*Id.* ¶ 73; Street Dep. [40-2] at 193:21–194:6). Street testified that during the HR interview, Moss told her: "I already know how this is going to go. We are going to talk about him, he's going to deny it, and this is going to be the end of it." (PSOF [45] ¶ 15; Street Dep. [40-2] at 187:9–19.) She also testified that Moss rolled her eyes at Street during the interview. (*Id.*) At the conclusion of the interview, Street acknowledged

that she felt safe returning to work but determined on her own that she would not return to the cafeteria. (DSOF [40] ¶ 60; Street Int. Notes [40-6] at 4.)

MercyHealth's HR Department continued its investigation. Christine Moss spoke with the Security Supervisor, Traci Switzer-Cacciapaglia, and learned that the cafeteria video cameras did not record audio; she "concluded that video footage without audio would not aid in the investigation because the complaint and dispute revolved around the nature of the comments made between Ms. Street and Mr. Lottie," so it appears she did not get a copy of the footage. (Moss Decl. [40-13] ¶ 11; DSOF [40] ¶ 34.) Brittany Hereford and Kirstin Dach—presumably another HR professional, though the record does not clarify—then interviewed Willett, the person Street spoke to immediately after the cafeteria exchange, who confirmed that she (Willett) did not see what happened in the cafeteria but had told Street to report what had happened to HR and to prepare a written statement. (DSOF [40] ¶ 36; Willett Int. Notes [40-14] at 1.)

On August 6, 2024, Brittany Hereford and Christina Moss interviewed Lottie. (DSOF [40] ¶ 37; Hereford Decl. [40-5] ¶ 22.) Lottie told them that he met Street at a clinic appointment, where she gave him her phone number. (DSOF [40] ¶ 37.) Lottie said that they flirted; that he went to her house one night until his wife arrived; that he came back later and they slept together; and that at a second appointment, Street changed his chart to reflect that he used drugs. (*Id.*) He saw this notation later on his "MyChart" record and claims that he warned Street (the record does not say when) that he would report her conduct to HR unless she changed the record. (*Id.*) Lottie denied having grabbed Street's buttocks during the second appointment, and although he acknowledged having approached Street in the cafeteria to tell her that his medical record had been "fixed," he denied making any sexual remarks. (*Id.* ¶¶ 39, 40.) He also said Street began yelling about harassment when another person arrived during the cafeteria exchange, so he "backed off." (*Id.* ¶ 41.) When asked whether he had said "anything about [Street's] needing 'dick,'" Lottie became upset and, according to the investigation notes, "swore on his dead mother that he never said anything like that." (HR Int. Notes Lottie [40-7] at 5.)

The next day, on August 7, Hereford reached out to Sarah Cook, a privacy coordinator, to conduct a privacy audit of Lottie's medical records. (Hereford Decl. [40-5] at 4.) The audit showed that Street had accessed Lottie's medical records on days she worked in a different clinic and potentially without a business need, though there was no way to determine whether Street had falsified Lottie's records or altered them in any way. (*Id.* ¶¶ 44, 45; HR Investigation Timeline [40-11] at 2; Hereford Decl. [40-5] ¶ 33.)

Two weeks later, on August 23, 2024, Brittany Hereford interviewed Willis, Street's cousin and Lottie's friend, by telephone (perhaps because Lottie identified Willis as a person who could confirm the nature of his relationship with Street). (DSOF [40] ¶ 43; Hereford Decl. [40-5] ¶ 35.) *See* HR Int. Notes Lottie [40-7] at 5.) Willis confirmed that she had not witnessed any of the interactions between Street and Lottie, but told Hereford she understood that Street and Lottie had engaged in sex, and that Street ended the relationship because Lottie had lied to her about his marital status. (DSOF [40] ¶ 43.)

Hereford and Moss concluded that Street's complaint could not be substantiated because the parties had provided conflicting accounts of the events, and because there were no firsthand witnesses to the incidents. (*Id.* ¶ 47; Hereford Decl. [40-5] ¶ 38.) HR nevertheless issued a no-contact instruction to Lottie, and he agreed to comply. (DSOF [40] ¶ 48.) HR took no other disciplinary action against Lottie, and on August 23, 2024—the same day that HR interviewed Willis—Hereford informed Street that the investigation had concluded. (*Id.* ¶¶ 49, 50.) She told Street that the complaint had not been substantiated, but that Lottie had been issued a no-contact instruction, and that Street should report to HR if Lottie bothered her. (*Id.* ¶ 50.) As Street sees things, the investigators "failed to interview key witnesses and misunderstood portions of her complaint." (PSOF [45] ¶ 12.) She admits she did not know if there were any witnesses who overheard the cafeteria incident (Pl. Resp. DSOF [44] ¶ 29), but says that her coworkers knew about the earlier incident where Lottie grabbed her buttocks, and while she admits they did not witness that incident, either, she testified that HR should nevertheless have interviewed them

because "they were witnesses to [her] anger, when [she] came out of th[e] room." (Street Dep. [40-2] at 208:14–209:19.) Defendant asserts that the investigation would ordinarily have been concluded with a wrap-up meeting and an investigation letter via email. That did not happen in this case: because Street was very upset, accused HR of not conducting a sufficiently thorough investigation, and provided new information about the cafeteria incident (that Lottie had touched her in the cafeteria), HR instead asked Plaintiff to come in again to clarify her statements. (Ex. J, HR Investigation Timeline [40-11] at 2–3.) Street refused this additional meeting and asked that her handwritten note to be returned to her. (*Id.* at 3.)

Street contends the investigation was inadequate in several respects. As noted, she believes HR personnel should have interviewed Rockton or Riverside employees who could substantiate her version of the events and confirm that she was anxious following the two incidents. She admits, however, that none of these employees were witnesses to the "patient" incident or the "cafeteria" incident. (DSOF [40] ¶¶ 66, 67, 76.) Street also believes that Moss and Hereford, the two HR employees who interviewed Street in connection with the investigation, discriminated against her. In support of this contention, she says that Moss told her it was okay if she had slept with Lottie, that Hereford and Moss would later discuss Street's use of profanity and threats toward Lottie, and that because Lottie was not an employee at the time of the "patient" incident,[5] nothing could be done. (DSOF [40] ¶ 68; Street Dep. [40-2] at 271–72.) Street recalls that Moss also predicted that Lottie would provide a different version of the events. (Street Dep. [40-2] at 273:5–20.)

On August 25, Street emailed Hereford to "recap" the August 23 call in which Hereford had reported the conclusions reached in the investigation. Street's email message expressed

[5] In his deposition, which took place in August 2025, Lottie testified that he had worked at MercyHealth for about three years; the patient incident occurred in early 2024, meaning that he was in fact employed by MercyHealth at the time of the 2024 incident. (Lottie Dep. [40-3] at 9:9–10:3.) Presumably MercyHealth means that in 2024, Street had contact with Lottie in his role as a patient rather than as a coworker.

disappointment and anxiety about the fact that Lottie would not face additional consequences for his actions; she wrote, "it makes me feel very disappointed and nervous at the idea that if (and when) it happens again, Mr. Lottie would face no consequences other than another conversation with Human Resources." (Email [40-17] at 6–7.) She also inquired, "[c]an I be transferred to another location? I don't think [Lottie] would go to the clinic in Byron, IL." (*Id.* at 7.) Street also again asked that her handwritten note be returned. (*Id.*; DSOF [40] ¶ 51.)

On August 28, Hereford responded, saying that she would contact Street by phone that afternoon. (DSOF [40] ¶ 52.) Street asked Hereford to respond by email instead because she lacked trust in the process and wanted everything in writing, but Hereford said that they would need to meet in person, along with two HR business partners, to discuss the issues further. (Email [40-17] at 2–4.) After several emails about the potential meeting, including Hereford's clarification that the purpose of the meeting would be to speak further about Street's concerns, Street ultimately declined the meeting, on the basis that "right now is not a good time" and that she "need[s] to be in a better mental and emotional state before [she could] meet with anybody for any reason." (DSOF ¶ 57; Email [40-17] at 1–2.) Indeed, Street said that it was difficult to go to work and hard even to pull into the parking lot after the cafeteria incident, and she experienced nausea when going to work. (PSOF [45] ¶ 6.)

Within an hour of this email exchange, Street texted her immediate supervisor, Andrea Voss, asking "[i]s mercy firing me?" (Text Exchange [40-18] at 2.) Voss responded, "I don't know what you mean," to which Street replied, "Brittany wants a meeting with her and 2 HR Business Partners." (*Id.* at 3.) Voss responded that she was "truly not aware of anything on HR end," to which Street replied, "I just need a break or time to recover so that I can do my job." Voss wrote back, "[e]veryone is here to support you." (*Id.*) Voss also offered Street the opportunity to work the next day at another location, but Street declined, saying she was seeing a doctor to "see if [she] [could] get more stabilized" and that she just needed time to "recover or breathe." (*Id.* at 4–5; DSOF [40] ¶ 54; Ex. Q, Text Exchange [40-18] at 4–5.)

On August 29, Street received a note from her physician asking that she be excused from work from August 29 until September 9. (DSOF [40] ¶ 63.) Then, on September 9, 2024, Street sent an email to Hereford with the subject line "I QUIT." (Resignation [40-20] at 1.) She wrote: "You know why. I do not want to work for Mercy Health ever again and do not recommend anyone else to work for a company that violates their own policies and the law." (*Id.*) Between August 1 and August 29, Street had seen only "the back" of Lottie on a single occasion; she otherwise had no other contact with him. (DSOF [40] ¶ 61.) Street also testified that, during this period of time, she ate only in the first-floor cafeteria and did not go to the lower-level cafeteria (where Lottie worked) except on rare occasions when accompanied by a coworker. (PSOF ¶ 7; Street Dep. [40-2] at 141–142.)

## LEGAL STANDARD

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Jones v. Das*, 164 F.4th 1024, 1032 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023) (quoting *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022)). In considering a motion for summary judgment, the court construes the facts in the light most favorable to the nonmoving party and draws "all reasonable inferences in [her] favor." *Blumenshine*, 150 F.4th at 886. "'An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment.'" *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 (7th Cir. 2022) (citation and internal quotation marks omitted). The court does not "weigh evidence or determine the credibility of a witness's testimony." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Such questions are left for the finder of fact. *Id.*

To survive a motion for summary judgment, the opposing party must "set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Specifically, there must be affirmative evidence supporting a jury finding in favor of the non-moving party, without relying on conjecture, speculation, or unsupported allegations in the pleadings. *See Anderson v. Mott St.*, 104 F.4th 646, 652 (7th Cir. 2024); *see also Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 n.5 (7th Cir. 2021).

**DISCUSSION**

Street brought her claims under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981,[6] and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), alleging sex-based discrimination, sex-based harassment, and retaliation under Title VII. The court considers each claim in turn.

**I. Title VII Discrimination**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). A plaintiff may prove employment discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in which a plaintiff makes out a prima facie case of discrimination by showing that "(1) [s]he belongs to a protected class; (2) [s]he met [her] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) another similarly situated employee outside of [her] protected class received better treatment from [her] employer." *Igasaki*, 988 F.3d at 957 (citation omitted). If the plaintiff establishes a prima facie case, the employer then has the burden to

[6] Plaintiff mentions Section 1981 briefly in her complaint (Compl. [1] ¶¶ 1, 14), but made no specific allegations in support of this claim, and neither party has addressed it in the summary judgment briefing. The court concludes she does not pursue a Section 1981 claim here.

"articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802.

The *McDonnell Douglas* framework is not the only way for a plaintiff to proceed. *Igasaki*, 988 F.3d at 957. "When a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the discharge or other adverse employment action." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025) (quoting *Igasaki*, 988 F.3d at 957 (cleaned up)). All evidence that the plaintiff offers in support of the discrimination claim, whether direct or circumstantial, "must be evaluated as a whole." *Igasaki*, 988 F.3d at 957 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)). Under *Ortiz*, courts ask "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Id.* at 958.

Under either analysis—the four-step *McDonnell Douglas* framework or the *Ortiz* totality-of-the-circumstances approach—Street's sex discrimination claim fails. First, Street does not offer evidence that MercyHealth took adverse action against her, a requirement under both proof paradigms. She must show that she suffered "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 975 (2024). While the harm need not be significant, *see id.* at 971, it must amount to "some quantitative or qualitative change in the terms or conditions of [Street's] employment that is more than a mere subjective preference." *Paterakos v. City of Chicago*, 147 F.4th 787, 796 (7th Cir. 2025).

Street claims that she has circumstantial evidence that satisfies this element of her claim. She contends that "a reasonable jury could conclude that the combination of threatened discipline, the manner in which the investigation was conducted, and the requirement that Plaintiff continue working in proximity to her alleged harasser created materially disadvantageous working conditions." (Pl. Mem. Opp. MSJ [43] at 7.) She notes, in particular, the following: (a) Christine Moss, the HR representative, "indicated early in the interview that the investigation would likely

end with Mr. Lottie denying the allegations and nothing further would happen;" (b) "Moss rolled her eyes during the interview and cautioned [Street] that her statements to Mr. Lottie could result in a complaint against [Street] under the workplace violence policy;" (c) Moss stated that she would need to "circle back" with Street to discuss the violent language Street had used toward Lottie; (d) HR declined to obtain the cafeteria video footage because it did not contain an audio recording; (e) HR did not interview Street's coworkers (who did not witness either encounter with Lottie); (f) MercyHealth imposed a no-contact directive on Lottie "while requiring Plaintiff to continue working in the same building as Mr. Lottie," causing her distress; and (g) when Plaintiff requested a transfer to the Byron clinic because she "wanted to feel safer at work and avoid further contact with Mr. Lottie," Defendant suggested a telephone discussion of this issue, which Plaintiff refused. (Pl. Mem. Opp. MSJ [43] at 6–7; DSOF [40] ¶¶ 55, 57.) Plaintiff notes, further, that she "changed her eating patterns to avoid areas where she might encounter Mr. Lottie." (Pl. Mem. Opp. MSJ [43] at 7.)

Some of these incidents may have been personally difficult for Ms. Street. When "evaluated as a whole," however, *Ortiz*, 834 F.3d at 766, they do not add up to "some harm respecting an identifiable term or condition of employment." *Muldrow*, 144 S. Ct. at 969. Street received no discipline, write-up, or reprimand for her behavior with respect to Lottie or the investigation. (Pl. Resp. DSOF [44] ¶ 74.) Moss only referred to a potential future converssation with Street about the way she spoke with coworkers, a reasonable reaction to learning that an employee threatened to "fuck [Lottie] up" and "slit his throat." (Pl. Resp. DSOF [44] ¶¶ 73, 74.) In any event, HR never did "circle back" to this conversation nor did anyone discipline Street for her comments. (*Id.* [44] ¶ 74.) Even if Street interpreted the conversation to mean that she could face some discipline for her statements, "[a]n unfulfilled threat, which results in no material harm, is not materially adverse" for the purposes of a Title VII discrimination claim. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003).

To the extent that Street wanted to avoid further contact with Lottie, HR honored that request by issuing a no-contact order. Street avoided the lower-level cafeteria and used the first-floor cafeteria instead (PSOF [45] ¶ 7), but she does not allege that MercyHealth required her to do so or otherwise restricted her movement. An adverse employment action "is more than a mere subjective preference." *Paterakos*, 147 F.4th at 796 (quoting *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018). Furthermore, Street and Lottie "have never worked together and based on their normal job duties, they had no need to interact for work purposes." (Pl. Resp. DSOF [44] ¶ 58.) To the extent that Street wanted an assignment to another work location, HR did not turn her down; HR staff asked to speak with Street about the request and her other concerns, an invitation that Street refused. (*Id.* ¶¶ 56–57.) And Street's own supervisor, Voss, offered to assign her to a different location the day after the investigation was concluded.

Street was unhappy about the investigation and its outcome, but "not everything that makes an employee unhappy is an actionable adverse action." *Madlock*, 885 F.3d at 470 (citation and internal quotation marks omitted). In *Madlock,* an African American plaintiff had been transferred to a new department, characterized by a coworker a "demotion" and "total humiliation," and brought a race discrimination claim against the company. *Id.* The Seventh Circuit affirmed the district court's entry of summary judgment for defendant in part because neither Madlock's coworkers' perceptions of the transfer nor her own made it an adverse employment action. *Id.* at 471. Here, too, Street's own perceptions about the investigation do not make its outcome an adverse employment action. "Whether an action is adverse requires an amount of objectivity, otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Id.* (internal quotation marks and citation omitted.) Notably, Street has not argued that her September 9 resignation amounted to a constructive discharge, nor could she make the required showing. *Kedas v. Ill. Dep't of Transp.* 149 F.4th 951, 957 (7th Cir. 2025) (noting two ways to show constructive discharge: where the resignation results from discriminatory working conditions worse than those required for a hostile

work environment claim, and where the employer acts in ways that make it is clear to a reasonable employee that termination will occur absent resignation).

In the absence of any showing of an identifiable adverse action, the court need not address the question of whether a reasonable factfinder could find her sex caused such an action. It is worth noting, however, that Street's only argument on this score appears to be that Lottie "received more favorable treatment during the investigation process" (Pl. Mem. Opp. MSJ [43] at 8), a reference to the *McDonnell Douglas* framework, for which a plaintiff must show that a similarly situated worker outside the protected class received more favorable treatment. *See Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 792 (7th Cir. 2020). A "similarly situated employee[] must be directly comparable to the plaintiff in all material respects." *Igasaki*, 988 F.3d at 958. In determining whether an employee is similarly situated, courts consider whether the employee "held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014).

Street identifies Lottie as her male comparator who received more favorable treatment during the investigation process, but this is unconvincing. (Pl. Mem. Opp. MSJ [43] at 8.) Lottie and Street held different positions and performed different tasks under different supervisors. Both engaged in inappropriate behavior in the workplace. Both were interviewed by HR staff. Lottie's unwanted touching and sexually offensive conduct appears to be worse than Street's swearing and threats of violence against him. As a result, Lottie was issued a no-contact order. No such order was imposed on Street. The penalty Lottie faced does not satisfy Street, but she has not shown that he was treated more favorably than she was.

The court grants summary judgment to Defendant on this claim.

## II. Sexual Harassment

Street next claims that Lottie's conduct during the patient visit and the cafeteria incident subjected her to a hostile work environment, for which MercyHealth is liable under Title VII. To establish such liability, Street must produce evidence showing that: "(1) her work environment

was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Anderson*, 104 F.4th at 652 (quoting *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018). The harassment "need not be severe *and* pervasive to impose liability; one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). In determining whether a working environment is hostile or abusive, courts look at "all of the circumstances," which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sanchez v. El Milagro, Inc.*, 176 F.4th 961, 969 (7th Cir. 2026) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

As for employer liability, MercyHealth may be held liable only "if it was negligent in controlling working conditions." *Sanchez*, 176 F.4th at 971. This means that in order for MercyHealth to be held liable, Street must show that her employer had "notice or knowledge of the harassment," but "did not take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Id.* (citation and internal quotation marks omitted).

The court will assume for purposes of this decision that Street experienced a hostile environment, but this is not at all clear. Street cites the patient incident, where Lottie "grabbed and squeezed her butt and grabbed it hard," and the cafeteria incident that occurred a few months later, where Lottie made "explicit sexual remarks" while "breathing down [her] neck." (Pl. Mem. Opp. MSJ [43] at 9–10.) But the cases she cites involve far more offensive and prolonged conduct. First, in *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899 (7th Cir. 2002), the plaintiff's supervisor asked her for sex three times during a meeting, first for oral sex, then, after she refused, for a "threesome," and finally for "phone sex." *Id.* at 902. The plaintiff there also testified that he had harassed her on previous occasions, grabbing her breasts and forcibly kissing her. *Id.* Her employer "did nothing about it." *Id.* In *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798

(7th Cir. 2000), the plaintiff alleged that "a fellow supervisory employee . . . grabbed her face one day at work and stuck his tongue down her throat. On the following day, he tried to kiss her again and when she struggled to evade him, he began to unfasten her brassiere, threatening to 'undo it all the way.'" *Id.* at 801. He also told her that "while she was serving customers, . . . that he could perform oral sex on her so effectively '[she] would do cartwheels.'" *Id.* After weighing the "limited number of acts involved," the court held that a factfinder could deem the acts "severe enough" to constitute a hostile work environment because of the "physical, intimate, and forcible character of the acts at issue," and reversed summary judgment in favor of the employer. *Id.* at 808, 809.

Lottie's conduct, while unpleasant, was less troublesome. Lottie allegedly grabbed Street's buttocks once, but immediately stopped when she swatted his hand away, unlike the males' persistence described in the fact patterns above. (DSOF [40] ¶ 16.) Lottie's alleged language during the cafeteria incident, while vulgar, did not directly solicit her for sexual acts, nor did he couple his vulgar language with escalating, forcible physical contact, as in *Quantock.* "[S]evere, assaultive speech, especially of a repetitive nature," can create a hostile work environment, *Sanchez*, 176 F.4th at 969, but Lottie's comments occurred on just one occasion months after the offensive touching. *Contra Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788–89 (7th Cir. 2007) (holding that eighteen sexist or sexual comments over ten months created a triable issue of fact for a jury as to whether the workplace was hostile).

The court need not decide whether Street experienced an offensive work environment, however. If the court were to find in her favor on this issue, the evidence does not support a finding that MercyHealth is liable. An employer is liable for harassment by a plaintiff's coworker only if "it was negligent in controlling working conditions." *Sanchez*, 176 F.4th at 971 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). Thus, to hold MercyHealth liable, Street must show that MercyHealth managers knew of the harassment, and did not take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Id.*

(quoting *Cole v. Bd. of Trs. Of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016). So long as MercyHealth took "reasonable steps to discover and rectify" co-employee harassment, it cannot be held liable. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022) (citation omitted).

MercyHealth's management was not put on notice of the harassment until August 1, 2024, when Street reported it, and could not have been expected to take corrective action before that date. (PSOF [45] ¶ 5.) Street acknowledges that MercyHealth conducted "some form of investigation" after the cafeteria incident, though she disputes its adequacy. (DSOF ¶ 66; Pl. Mem. Opp. MSJ [43] at 11.) As explained, she is suspicious about Moss's alleged statement that Moss "already knew how the investigation would end," and the fact that Moss rolled her eyes during Street's interview, and troubled by Moss's failure to review the cafeteria video footage or to interview other clinic employees (though they had witnessed the encounters with Lottie). (Pl. Mem. Opp. MSJ [43] at 12, 15.) And, apart from the no-contact order, MercyHealth did not otherwise discipline Lottie, meaning, Street contends, that a jury could conclude that MercyHealth's conduct "was not reasonably calculated to end the harassment or protect Plaintiff from further misconduct." (Pl. Mem. Opp. MSJ [43] at 11–12.) Street cites *Berry v. Delta Airlines, Inc.*, 260 F.3d 803 (7th Cir. 2001), but it is not clear why she believes that case supports her claim: in *Berry*, the Seventh Circuit affirmed summary judgment in favor of Delta Airlines, in part because "Delta acted promptly and appropriately to end the harassment" by immediately beginning an investigation after the plaintiff complained. *Id.* at 812. As in this case, the plaintiff in *Berry* argued that "Delta should have taken even more aggressive measures . . . sooner." *Id.* at 813. But the Seventh Circuit held that "all Delta was required to do in order to satisfy its obligations under Title VII was to take prompt action reasonably calculated to end the harassment and reasonably likely to prevent to conduct from recurring." *Id.*

MercyHealth did just that. Moss and Hereford met with Street the morning after first learning of her complaints of harassment; Moss allegedly rolled her eyes and predicted that Lottie

would deny the allegations, but she and Hereford did proceed with an investigation. They interviewed the only witnesses to the cafeteria incident—Street and Lottie—but also spoke to Street's cousin, Willis, and Lisa Willett. (Hereford Dec. [40-5] ¶¶ 17, 35.) Street believes other employees should have been interviewed as well, but does not dispute that her coworkers did not witness the relevant events, and has not explained what information they could have provided that would have changed the outcome of the investigation. (Pl. Resp. DSOF [44] ¶¶ 36, 43.) Perhaps Hereford and Moss should have reviewed the video footage, but Street had not alleged any physical contact in the cafeteria—she only reported statements that the video cameras would not have picked up without an audio function. The day after the incident, when asked whether she felt safe in returning to work, Street said she was. (Street Int. Notes [40-6] at 4.) At the conclusion of the investigation, Hereford and Moss issued the no-contact order to prevent Lottie from further harassing Street (Moss Decl. [40-13] ¶ 18), and Plaintiff in fact had no contact with him after the report to HR. Even if Street believes MercyHealth should have taken more aggressive measures to punish or deter Lottie, MercyHealth satisfied its burden of taking reasonable steps to prevent the harassment from recurring. Defendant is entitled to summary judgment on this claim as well.

## III. Retaliation

In addition to prohibiting discrimination, Title VII also makes it unlawful for an employer to retaliate against employees for complaining about harassment or discrimination. 42 U.S.C. § 2000e-3(a). To advance to trial on this claim, Street must provide evidence from which a reasonable fact finder could conclude that (1) she "engaged in activity protected by the statute"; (2) she "suffered an adverse employment action"; and (3) the protected activity caused the adverse action. *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023). An adverse employment action in this context is one that would "dissuade a reasonable worker of making or supporting a charge of discrimination," and Street "must show that the employer took the adverse

employment action because of the protected activity." *Id.* (cleaned up) (citations omitted). Street engaged in a protected activity, but she does not allege facts sufficient to find that she suffered an adverse employment action caused by the protected activity.

Street engaged in protected activity when she reported Lottie's sexual harassment to her employer. *See, e.g.*, *Alley v. Penguin Random House*, 62 F.4th 358, 362 (7th Cir. 2023); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). But she has not presented evidence that she suffered an adverse employment action in response, sufficient to dissuade a reasonable worker from engaging in the protected activity. In attempting to show that she was subject to adverse action, Street notes, first, Moss's comment that she would "circle back" to discuss the way Street spoke with coworkers—a comment that Plaintiff understood as a reference to potential discipline. (Pl. Mem. Opp. MSJ [43] at 14). Second, she points to "the circumstances following Plaintiff's complaint," like "requiring Plaintiff to continue working in the same workplace environment where Mr. Lottie could approach her," and changing which cafeteria she used within the building, circumstances that "made her physically ill." (*Id.* at 14–15.)

As for Street's first argument, the Seventh Circuit has repeatedly held that unfulfilled threats of future discipline do not meet the standard of injury or harm required for a Title VII retaliation claim. *See Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (collecting cases). Moreover, Moss's statement that she would need to "circle back" with Street did not imply that any discipline would take place; rather, it appears that Moss merely reinforced the workplace violence prevention policy and cautioned Street against using threatening language that Street admits she uttered. (Street Int. Notes [40-6] at 3.) Under this Circuit's standards, Moss's conduct, even if perceived as a threat of future discipline, does not rise to the level of an adverse action for retaliation purposes.

Street's argument that the circumstances that followed from her complaint constitute adverse action have little merit. Requiring Street to work in the same building as Lottie does not constitute a materially adverse action: she told HR she felt safe to return to work, and she and

Lottie did not work together. (Pl. Resp. DSOF [44] ¶¶ 58, 60). MercyHealth did not impose a requirement on Street to use a particular cafeteria; this was her own choice. A retaliation claim requires a showing that the employer itself took adverse action. *See Burlington v. Northern & Santa Fe Ry. Co.*, 548 U.S. 53, 57 (2006) (holding that Title VII's antiretaliation provision covers "*employer actions* that would have been materially adverse to a reasonable employee" (emphasis added)). Street's dissatisfaction concerning the process or outcome of the investigation does not support her claim that she was the victim of retaliation.

## **CONCLUSION**

Street has failed to show that there is a genuine issue for trial on her Title VII sex-based discrimination, sex-based harassment, or retaliation claims. Defendant's motion for summary judgment [38] is granted. The Clerk is directed to enter judgment in favor of Defendant MercyHealth and against Plaintiff.

ENTER:

Dated: September 30, 2026

REBECCA R. PALLMEYER
United States District Judge